### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### KIT MANUFACTURING COMPANY, Appellee.

No. 17057.

United States Court of Appeals
Ninth Circuit.

July 5, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Morton Namrow, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Elis A. Weston, Boise, Idaho, for respondent.

Before HAMLEY, HAMLIN and KOELSCH, Circuit Judges.

HAMLIN, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order of April 27, 1960, requiring the Kit Manufacturing Company, respondent herein, to cease and desist from certain alleged unfair labor practices and to take certain affirmative action in connection with the reinstatement of Elsworth Jordon, a former employee.

The Board found that the respondent violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158 (a) (1), by threatening employees with reprisals if they should engage in union activities and by promising and instituting employee benefits in return for rejecting unionization. The Board also found that the respondent violated Section 8(a) (3) and (1) of the Act, 29 U.S.C.A. § 158(a) (3) and (1), by discharging employee Jordon because of his union activities.[1]

The respondent is a California corporation engaged in the manufacture and sale of trailers and mobile homes at plants in Long Beach, California, and Caldwell, Idaho. The Caldwell plant, where the events with which this case is concerned occurred, commenced production in December of 1958. From that time through August 24, 1959, the date of the amended complaint in this proceeding, sales and shipments of trailers and mobile homes valued in excess of $65,000 have been made from the Caldwell plant to points outside the State of Idaho. This court has jurisdiction under the provisions of

1. 29 U.S.C.A. "§ 158. Unfair labor practices
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
\* \* \* \* \*
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*."
29 U.S.C.A. "§ 157. Right of employees as to organization, collective bargaining, etc.
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection \* \* \*."

Section 10(e) of the Act, 29 U.S.C.A. § 160(e).

Soon after the establishment of the Idaho plant, three labor unions became interested in organizing it. An election was held on June 4, 1959, and the two highest vote totals were for "non-union" and the Lumber and Sawmill Workers. A run-off election was held on June 24, and a majority of the votes was cast for "non-union." Objections to the election were filed, and on October 13, 1959, the Board set aside the run-off election and directed that another be held. This case is concerned with events that occurred in the period before the elections and which the Board found to be unfair labor practices.

The findings made by the trial examiner with regard to the violation by the respondent of Section 8(a) (1) were substantially as follows. Some time in March of 1959 plant manager Ray Skinner summoned the entire finishing crew to his office where he told the workers that he could do more for them than any union. He said that if the union came in he could not afford to pay women a union scale to perform men's work and that he would have to replace them with men who could perform heavier duties.[2] He further stated that if the union came in nobody would have a job and that "he would have to close [the plant] down and everyone would lose their jobs." On the night of March 17, 1959, Donald Jessen, a Kit employee, was told by Skinner, "If you'll string along with me, I can do more for you than any Union. I know you're happy making $1.45 an hour * * * but if you'll string along out here with me and help us, we'll help you. You won't be making that $1.45, you'll be beating that." The conversation was the result of Jessen's statement that he wanted a union because it would result in better working conditions. About one week before the June 4 election, Skinner called about twelve employees to his office. He there stated that the plant did not need a union as it was "premature";

that respondent would rather wait before union activities commenced; that employees should not attend union meetings; that it would be desirable to wait for one year to ascertain how the plant progressed. He again stated that rather than pay male wages to women, he would discharge the female employees and replace them with men, and he also said that "before he would pay union wages * * * he would know who voted and he would let us go." At this meeting, Skinner for the first time brought up the question of a group insurance plan for the employees, stating that respondent had been trying to install one at the plant but "that it would probably be a year but that he would work on it and see if he couldn't get it sooner." At another meeting on June 3 with some employees, Skinner stated that respondent would not be dictated to, that respondent "would not tolerate a Union and if necessary they would dismiss the entire crew if they went Union and start with a new crew." He also said "If you vote Union, you can be dismissed from the company for voting Union." On the morning of June 24, which was the date of the run-off election, about 15 employees were brought to a meeting in Skinner's office where he immediately brought up the insurance plan, explaining that respondent was now in a position to install a group insurance plan. After speaking of the advantages of the plan, he then spoke of the election and stated that "they should vote for the plant and not for the unions." He distributed cards concerning the insurance plan and asked that they be signed and returned within a day or two in order to put the plan into effect. The trial examiner stated that he was convinced that the announcement of the plan was timed so as to offer employees an economic benefit in return for rejecting unionization in the election later that day.

The findings made by the trial examiner with regard to the violation of 29 U.S.C.A. § 158(a) (1) and (3) were sub-

2. The record does not disclose which positions in the plant were filled by women.

stantially as follows. Elsworth Jordon was hired as a maintenance man on or about February 1, 1959, following a meeting with Skinner at the Stringbusters Lounge [3] immediately after he had attended a union meeting. The rate of pay was agreed upon, and Jordon was promised a raise of 30¢ an hour in three weeks. When he reported to work the following morning, Skinner told him that he did not want him to attend any union meetings, that he would be "blackballed" if he did, and that it would help if he spoke against unionization. Jordon promised to have nothing to do with the union and apparently kept his word until some time in mid-March—the change of heart resulted from the fact that the promised 30¢ an hour raise did not materialize. About March 1, 1959, Skinner accused Jordon of attending union meetings contrary to his promise. Jordon denied the the accusation, but he subsequently did resume attendance of union meetings, attending them on March 17, 24, and 31. Skinner was present in the adjacent bar on the night of the March 17 meeting and talked to Jordon after the meeting.[4] He also saw Jordon after the March 31 meeting but did not talk to him at that time. On the following morning, April 1, Jordon telephoned the plant, told his foreman that he had a foot infection, and obtained permission from his foreman to be absent. The latter said he would notify Skinner. This was in accordance with Skinner's prior instruction to "call in" in case of absences, for he had not specified whom to call. On the following morning, April 2, Jordon's feet were still troubling him, and he testified that he telephoned the plant, was connected with the office girl and notified her that he would be absent that day as well. She agreed to notify his superior. Jordon visited a local physician that morning. That afternoon, about 1:30, while treating his feet

at home, Jordon saw in the local paper an advertisement placed by a local employment agency seeking a maintenance man (this was the job that he held). He promptly went to the plant, arriving there at about 2:30 p. m., realizing that by reason of the smallness of the community the ad referred to his job. He saw Skinner, showed him the advertisement, and asked if this meant that he was discharged. Skinner replied in the affirmative, telling him that he had been taking off too much time and that he had been staying overtime to do his work.

The findings of the trial examiner were adopted by the Board. As is usual in these cases, there was a conflict of testimony. Skinner denied some of the statements attributed to him by Jordon and others, but it was within the power of the trial examiner to determine what witnesses would be believed. Skinner also contended that Jordon was lacking in qualifications as a maintenance man and that he was discharged for this reason, as well as for smoking and loitering in the restroom. However, the trial examiner found that Jordon's foreman had told him three weeks after he was hired that he was progressing satisfactorily and that Skinner also told him to keep up his good work. Jordon was never warned about the possibility of discharge.

Respondent also introduced some testimony concerning an incident on March 21 when Jordon was called in on a Saturday morning to perform some urgent assignment. It was contended that Jordon left after working about two or three hours and that someone else was required to finish the work. However, Jordon and witnesses produced by him testified that the job was finished and that he was authorized to leave for the day. After analyzing the testimony of the witnesses, the trial examiner found that Skinner's testimony "varied considerably" and the

---

3. The record discloses that the Stringbusters Lounge is a local bar and that the unions used attached private rooms for their meetings.

4. The trial examiner concluded that Skinner was well aware of the fact that a union meeting was being conducted in a room adjacent to the bar although his presence in the bar may well have been primarily social in nature.

testimony of "Tabor and Jordon herein is the more reliable." Various other inconsistencies in Skinner's testimony to which we need not refer, were pointed out by the trial examiner.

■■ It is the function of the trial examiner to pass upon the credibility of the witnesses. He refused to believe Skinner's contention that Jordon was not fired but that he quit, and he refused to believe Skinner's claim that he had decided to discharge Jordon "immediately after he was hired when he discovered that he was not qualified as a maintenance man."

We hold that there is substantial evidence upon the record as a whole to justify the decision of the Board holding that respondent was guilty of unfair labor practices.

Let the order of the Board be enforced.